**UNITED STATES of America ex rel. Harold WALKER et al., Petitioners,**

v.

**Vincent R. MANCUSI, Superintendent, Attica Correctional Facility, Respondent.**

**Civ. No. 1971-485.**

United States District Court,
W. D. New York.

Dec. 13, 1971.

On Motion for Reconsideration
Dec. 21, 1971.

Jesse Berman, Barry Satlow, New York City, and Kenneth Kimerling, Dennis Cunningham, Buffalo, N. Y., for petitioners.

Louis J. Lefkowitz, Atty. Gen. of State of New York (John H. Stenger, Sp. Asst. to Atty. Gen., and Richard R. Jenczka, Asst. Atty. Gen., of counsel), for respondent.

CURTIN, District Judge.

This action was initiated by a pro se complaint submitted to the court by petitioners[1] on October 26, 1971. They alleged that they were being held in A Block, 6 Company, of Attica Correctional Facility under conditions more restrictive

---

1. An amended complaint was filed November 29, 1971. Wayne Trimmer was not named as a petitioner in the amended complaint because he has been transferred from Attica Correctional Facility.

than those applied to the general population of the institution without notification that administrative disciplinary charges had been placed against them. They claimed that they were entitled to appearances before the Adjustment Committee of the facility established pursuant to the regulations of the Department of Correctional Services [2] and that the failure of state authorities to provide them such appearances constituted a denial of due process.

Citing Carter v. McGinnis, 320 F.Supp. 1092 (W.D.N.Y.1971), the court on October 28, 1971 ordered respondent to show cause why petitioners' demand for relief should not be granted. In response to the court's order, respondent filed an answering affidavit which did not rebut petitioners' allegation that they had not appeared before the Adjustment Committee. In pertinent part, the affidavit stated as follows:

[Petitioners] are housed in this area because they were believed to be active participants in the riot situation from September 9 through 13, 1971. They receive the same privileges as other inmates, with the exception of being permitted to work.

Further, petitioners will remain in this location until such time as investigation of the riot is completed and any action deemed appropriate is taken.

In light of the seriousness of petitioners' claims and the nonresponsiveness of respondent's answering affidavit, the court ordered a hearing to take the testimony of a representative of the state "fully knowledgeable about the circumstances of petitioners' current form of incarceration." Order dated November 19, 1971.

The hearing was held on December 1, 1971. The court heard testimony by Captain Walter T. Fogg, Acting Assistant Deputy Superintendent of Attica Correctional Facility. While Captain Fogg sincerely attempted to be of assistance to the court, it was evident that he was not "fully knowledgeable about the circumstances of petitioners' current form of incarceration." He has been assigned to Attica only since September 19, 1971. He was able to describe the conditions in A Block, 6 Company, but he had no information at all about the individual petitioners or why they were housed there.

Captain Fogg's description of A Block, 6 Company, differed only in minor detail from the facts set forth in petitioners' complaint. The conditions in A Block, 6 Company, differ from those in the general population areas and also from those in Housing Block Z, the principal segregation area. Captain Fogg explained that men were assigned to A Block, 6 Company, when Housing Block Z became overcrowded.

In contrast to the prisoners in general population, the inmates in A Block, 6 Company, are locked in their cells in excess of twenty-three hours a day and are allowed only a brief period of exercise in the yard when prisoners from other areas are not there. They eat in their cells rather than in the mess hall, and they do not work in the jobs they held prior to September 9, although as of November they receive the minimum pay of twenty cents an hour paid to inmates unassigned to jobs through no fault of their own.

Conditions in A Block, 6 Company, are not, however, as restrictive as those in Housing Block Z. The inmates of A Block, 6 Company, may have newspapers, magazines, and the use of radio earphones, all of which are unavailable to prisoners in Housing Block Z. They have commissary privileges and may receive packages from the outside. The exercise facility in Housing Block Z is more limited than that available to inmates of A Block, 6 Company. Finally, a man in Housing Block Z may suffer a loss of good time, while no such loss attaches to confinement in A Block, 6 Company.

---

2. The regulations, entitled "Procedures for Implementing Standards of Inmate Behavior and For Granting Good Behavior Time Allowances," were promulgated September 17, 1970. 7 N.Y.C.R.R., Chap. V.

 The court believes that these facts, while not establishing that the inmates of A Block, 6 Company, have been subjected to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, illustrate that their confinement "involves a harsh reduction of the privileges typically afforded inmates of the general population." Carter v. McGinnis, *supra*, at 1093, n. 1. Such confinement constitutes punishment sufficiently severe to require minimum due process safeguards. Due process requires at least that the prisoner be confronted with the accusation, informed of the evidence against him and afforded a reasonable opportunity to explain his actions. Sostre v. McGinnis, 442 F.2d 178, 194–199 (2d Cir. 1971).

As this court stated in *Carter*, the Department of Correctional Services' own disciplinary regulations "demonstrate an awareness of the due process guarantees retained by a prisoner." 320 F.Supp. at 1096. The regulations require that several steps be followed in disciplining inmates in order to assure that an inmate is not arbitrarily or capriciously punished.

The regulations require that an officer who observes an incident of inmate misbehavior make a written report as soon as practicable. Section 251.4. When the violation is serious and the officer has reasonable grounds to believe that the inmate represents a threat to the safety or security of the institution, the inmate may be confined immediately. Section 251.6. When an inmate is confined to his cell or to a special housing unit, however, the officer must make report before going off duty. Section 251.6(e) (1).

The regulations also provide that, when an inmate is confined in his cell or a special housing unit, he should be interviewed by the Adjustment Committee at its next meeting. Adjustment Committee meetings must be held at least once a week. Section 252.3. At the meeting with the inmate, the Committee must review the report of the incident, Section 252.3(c), and may direct a further in-vestigation. Section 252.3(d). The Committee must give the inmate an opportunity to be heard in explanation of his behavior and must make a written summary of the information received. Section 252.3(e). In cases in which the Committee determines that the inmate should be held in his cell or in a special housing unit pending disposition of the case, it must meet with him at least once a week. Section 252.3(f). If the Adjustment Committee takes punitive action, it must give the inmate guidance so that he understands the reason for its action. Section 252.5(c).

The Adjustment Committee has limited power to impose punishment, Section 252.5(e), but in cases in which the violation of rules is serious it may recommend that a Superintendent's Proceeding be held, Section 252.6, after which greater punishment may be imposed. Section 253.5.

Captain Fogg testified that the 38 men in A Block, 6 Company, were confined there after screening because they were suspected of being leaders and active participants in the September uprising, because criminal charges might be placed against them and because releasing them into the general population might endanger the security of the institution. Captain Fogg did not explain what he meant by screening, but he did make clear that neither Adjustment Committee meetings nor other proceedings had been held for them.

Captain Fogg justified the absence of Adjustment Committee hearings by pointing to the emergency at Attica Correctional Facility and to Section 251.6 (f) of the regulations, which reads:

(f) The provisions of this section shall not be construed so as to prohibit emergency action by the superintendent of the facility and, if necessary for the safety or security of the facility, all inmates or any segment of the inmates in a facility may, on the order of the person in charge of the facility, be confined in their cells or rooms for the duration of any period in which the safety or security of the facility is in

jeopardy. In any such case the superintendent shall immediately notify the commissioner.

■ A reading of Section 251.6(f) in context makes clear that it was not the intent of the regulations to supersede Adjustment Committee meetings and other proceedings when men are confined under the circumstances described in this case. Section 251.6(f), a subsection of Section 251.6, deals with initial special confinement only and does not provide for continued suspension of due process guarantees during a declared emergency.[3] Section 251.6(f) is intended to permit correctional authorities to confine a group of inmates when an emergency occurs without making findings that each individual represents an immediate threat to the security of the institution. For example, Section 251.6 (f) may have justified the indiscriminate placing of three men in a cell after state authorities regained control of the Attica Correctional Facility on September 13, 1971. The present situation is distinctly different. The facility has returned to an almost normal routine. Men work at their jobs, exercise in the yard, eat in the mess hall, receive visitors and, by recent direction of the Commissioner of Correctional Services, may be interviewed by newspapermen. To construe Section 251.6(f) in the manner suggested by the respondent makes meaningless the regulations' provision for hearing procedures. Assuming that an emergency as defined by Section 251.6(f) at one time existed, that period has long since passed. Therefore, the Department's own rules require that Adjustment Committee meetings and Superintendent Proceedings, if appropriate, be held.

■ Even assuming that Section 251.6(f) excuses the Attica authorities from giving the inmates of A Block, 6 Company, appearances before the Adjustment Committee and that the authorities have not violated their own regulations, due process requires that the inmates be afforded the minimum safeguards set forth in Sostre v. McGinnis, *supra.* As Carter v. McGinnis, *supra,* and Smoake v. Fritz, 320 F.Supp. 609 (S.D.N.Y.1970), make clear, the fact that inmates are confined because of their suspected participation in a prison disturbance does not justify depriving them of their right to due process. The language of the Court of Appeals in *Sostre* is particularly apt in this context:

> Thus, we do not doubt that Sostre was entitled to "due process of law" before he was punished for an infraction of prison rules. The exaction of segregated confinement was onerous indeed, and the distinction between a "right" and a "privilege"—or between "liberty" and a "privilege" for that matter—is nowhere more meaningless than behind prison walls. 442 F.2d at 196 (footnotes omitted).

The justification offered by Captain Fogg for the especially restrictive incarceration of the inmates of A Block, 6 Company, implies that the inmates are suspected of serious disciplinary infractions. Yet they have not been informed of the charges and evidence against them and offered an opportunity to respond to the charges. Appearances before the Adjustment Committee would at least begin to satisfy the requirements of due process in this regard. If the Adjustment Committee takes disciplinary action pursuant to Section 252.5 with its provision of only limited sanctions, the length of time the inmates have already been confined in A Block, 6 Company, may also require that correctional authorities hold Superintendent's Proceedings for the inmates in order to conform with their own regulations. *See* Sections 253.1–253.5.

■ Plaintiffs have brought this action as representatives of the 38 inmates presently incarcerated in A Block, 6 Com-

---

3. In contrast, the Department of Correctional Services' regulations providing for interviews of inmates by the news media contain separate provisions governing emergency situations. *See* "Administrative Bulletin, #9, Policy Statement and Guidelines on Release of Information to and Cooperative Effort with the News Media by Department of Correctional Services Personnel," §§ 7, 7A.

pany. The Court believes that a class action is proper in this situation. The proposed class comprising the inmates of A Block, 6 Company, is sufficiently numerous to make joinder impracticable, there is a common question whether the inmates are being denied due process by the failure of Attica officials to hold proceedings, the claims of the representatives of the proposed class are typical of the inmates and an order requiring that Adjustment Committee appearances be provided would fairly and adequately protect the interests of all the inmates. *See* Rule 23(a), F.R.C.P. In addition, correctional authorities have failed to act on grounds generally applicable to the class, making relief appropriate with respect to the class as a whole. See Rule 23(b) (2), F.R.C.P.[4]

Therefore, it is the order of the court that the inmates of A Block, 6 Company, be scheduled for appearances before the Adjustment Committee of Attica Correctional Facility beginning within 72 hours of the filing of this decision. The inmates may remain as currently confined during the pendency of the proceedings.

Each week the court shall be provided with the reports of the Adjustment Committee pertaining to the appearances of inmates of A Block, 6 Company.[5]

The court will retain jurisdiction and on short notice will entertain counsel's motions seeking further relief.

So ordered.

#### On Motion for Reconsideration

On December 16, 1971 respondent moved that the court reconsider its order of December 13 requiring officials of the Attica Correctional Facility to schedule the inmates of A Block, 6 Company, for appearances before the institution's Adjustment Committee beginning within

---

4. Due process requires that notice be given to members of the class in an action maintained under Rule 23(b) (2), F.R.C.P., although the particularized form of notice provided by Rule 23(c) (2), F.R.C.P., for a class action under Rule 23(b) (3), F.R.C.P., is not required. Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968). Therefore it is ordered that written notice be given by correctional authorities to each member of the class. *See* Dolgow v. Anderson, 43 F.R.D. 472 (E.D.N.Y.1968). The notice should read as follows:

> Several inmates of A Block, 6 Company, have started an action in the United States District Court for the Western District of New York. They complain that they are being housed in A Block, 6 Company, without hearings before the Adjustment Committee of Attica Correctional Facility.
> The court has allowed the inmates to sue on their own behalf and on behalf of all inmates of A Block, 6 Company, including you. If you do not wish to be a part of this action, you should write a letter to Judge John T. Curtin, 614 United States Court House, Buffalo, New York 14202, stating that you do not want to take part in the action. In connection with this action, the court has ordered that the inmates of A Block, 6 Company, be scheduled for appearances before the Adjustment Committee. Even if you have chosen to remain in this action, you need not appear before the Adjustment Committee. If you choose to meet with them, the Adjustment Committee will inform you of the behavior which led to your present confinement in A Block, 6 Company. You will also be given an opportunity to explain your behavior. The court's order does not require you to make an explanation of your behavior. At the conclusion of the meeting, the Adjustment Committee will tell you whether you will be released into general population or whether you will continue to be held in A Block, 6 Company. If the Adjustment Committee directs that you continue to be held in A Block, 6 Company, it will meet with you again each week during your confinement. The Adjustment Committee may also direct that you be given a Superintendent's Proceeding.

5. The reports should be made in a factual, detailed and informative fashion. Many of the reports received during the trial in Carter v. McGinnis, 320 F.Supp. 1092 (W.D.N.Y.1971), were of no use because the Adjustment Committee did not set forth the information received and in many cases merely stated that the inmate had a "poor attitude" or a "good attitude" and then recommended that the man be continued in Housing Block Z.

72 hours of the filing of the order. Counsel for petitioners agreed to a stay of the order pending argument of the motion, and the court ordered that argument be held December 17.

At argument counsel for respondent contended that the court's order of December 13 may have been in conflict with an oral order made by the Honorable John O. Henderson of this court on November 26, 1971 in Nieves v. Oswald, Civil No. 1971–526, in that Judge Henderson's order required a stay of all disciplinary proceedings at the Attica Correctional Facility arising out of the circumstances of the events of September 8–13. In addition, counsel contended that the confinement of the inmates of A Block, 6 Company, was not punitive but rather protective in nature, and that therefore Adjustment Committee meetings with the inmates were an inappropriate remedy to have been ordered. The testimony of Walter Dunbar, Executive Deputy Commissioner of the Department of Correctional Services, was offered in support of the latter contention.

Mr. Dunbar testified that A Block, 6 Company, ·had been designated as a special housing unit pursuant to Section 302.2 of the Department of Correctional Services "Procedures for Implementing Standards of Inmate Behavior and for Granting Good Behavior Time Allowances" ["Rules"], and that inmates had been assigned there under the protective admission provision, Section 304.1(b). Mr. Dunbar stated that the inmates, in the language of the provision, were either "potential victims," or persons who had to "be restricted from communication with the general inmate population" because they represented threats to the safety and security of the institution. The reliance placed upon protective admission as a rationale for the special confinement of the inmates of A Block, 6

Company, appeared to be a last resort by correctional authorities, for no reference to it was made earlier in this action. Indeed, Mr. Dunbar admitted on cross examination that the procedures required in the case of a protective admission to a special housing unit, *see* Sections 304.-1(b), 304.2(b) and 304.3 of the Rules, had not been followed although three months had elapsed since inmates were placed in the restrictive confinement of A Block, 6 Company. At the same time, he repeatedly assured the court that the procedures required by ·the Rules would be implemented immediately.

The court adheres to its opinion, expressed at argument on respondent's motion, that no conflict existed between its order of December 13 and Judge Henderson's order of November 26. But, in light of Mr. Dunbar's statement that the restrictive confinement of the inmates of A Block, 6 Company, is not for alleged infractions of the rules of the Attica Correctional Facility, the court has reconsidered its order that Adjustment Committee meetings be held.

The court is charged by the Civil Rights Act, Title 42, United States Code, Section 1983, and its jurisdictional complement, Title 28, United States Code, Section 1343, with the responsibility of assuring that the constitutional rights of prisoners are not violated. Where, as in this case, the court finds that inmates' confinement "involves a harsh reduction of the privileges typically afforded inmates of the general population," Carter v. McGinnis, 320 F.Supp. 1092, 1093 n. 1 (W.D.N.Y.1971), its task is the important but limited one of assuring that the special confinement is accomplished in accordance with procedural due process of law. It is not the court's concern whether correctional authorities designate restrictive confinement as punitive or protective.[1] Protective segregation of

---

1. Mr. Dunbar offered the following explanation of the difference between punitive and protective confinement. Punitive

confinement is a means of holding an inmate accountable for an infraction of the institution's rules. It involves a loss of

inmates has been upheld where the procedures resulting in confinement have not violated the dictates of due process. See Long v. Harris, 332 F.Supp. 262 (D.Kan. 1971). Nor is it the Court's concern which provisions of their own Rules correctional authorities purport to follow as long as the procedures afford the inmate due process.

■ In this context, one in which "substantial deprivations" are visited upon the prisoner, due process requires that the action taken be premised upon "facts rationally determined." Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971). Rational inquiry in turn requires that the inmate be confronted with the accusation, informed of the evidence against him and afforded a reasonable opportunity to explain his actions. *Ibid.* In other words, the inmate must be given a chance to participate in the initial fact-finding process.

■ The Rules require that protective admission to a special housing unit be made only where there is "substantial evidence" that such action is necessary. Section 304.3(a). By direction of Paragraph 2 of the "Guidelines for Review of Cases Assigned to VI Company, A Block and Special Housing Unit, Attica Correctional Facility" ["Guidelines"], the review of evidence will be made by the Superintendent. Although Section 304.3(d) of the Rules requires that that inmate be "specifically advised" of his right to communicate with the Commissioner of Correctional Services about his confinement, both the Rules and the Guidelines are silent about a right of the inmate to learn of, and respond to, the evidence against him before the Superintendent determines whether "substantial evidence" requires his protective admission to a special housing unit. Yet, as indicated by the foregoing

discussion, such a right is required by due process, although it is not necessary that the inmate be orally interviewed. Instead the Superintendent may communicate with him in writing.

In this connection, the court notes that the task of working out the details of the procedures called for by Sostre v. McGinnis, *supra,* is left to respondent, and that, by imposing the requirement that the inmate be given an opportunity to reply to the evidence against him, the court does not pass upon the sufficiency of the Rules and Guidelines in all possible applications.

It is respondent's position that the inmates confined to A Block, 6 Company, are under investigation for participation in the events of September 9–13. The court's decision shall not be construed as relieving respondent of the responsibility of informing the inmates of their constitutional rights in appropriate cases.

Therefore it is the order of the court that beginning within 48 hours of the filing of this decision the procedures discussed above be instituted as to each of the inmates of A Block, 6 Company. The inmates may remain as currently confined during the pendency of the determinations.

The court shall be provided weekly with copies of (1) the statements signed by any inmate consenting to his confinement in A Block, 6 Company, (2) the findings as to each nonconsenting inmate made by the Superintendent and (3) the reports made as to each nonconsenting inmate by the Superintendent to the Commissioner of Correctional Services.

The court will retain jurisdiction and on short notice will entertain motions seeking further relief, including a motion by respondent for a protective order.

---

privileges and may have an adverse effect on "good time" and the chance for parole. Protective confinement does restrict an inmate's movement within the facility and his contacts with inmates in the general population, but it is not punitive in intent and does not entail a loss of privileges or "good time."

In place of the notice set forth in footnote 4 of the court's decision of December 13, the notice in the margin [2] shall be reproduced and distributed by correctional authorities to each inmate of A Block, 6 Company, within 48 hours of the filing of this decision.

The court reaffirms the findings of fact and conclusions of law set forth in its decision and order of December 13, 1971. That decision and order shall be amended only to the extent explicitly required herein.

The court denies petitioners' motion for entry of an order directing that the inmates of A Block, 6 Company, be immediately returned to general population.

So ordered.

2. The notice should read as follows:

Several inmates of A Block, 6 Company, have started an action under the Civil Rights Act in the United States District Court for the Western District of New York. They complain that they are being housed in A Block, 6 Company, without due process of law.

The court has allowed the inmates to sue on their own behalf and on behalf of all inmates of A Block, 6 Company, including you. If you do not wish to be a part of this action, you should write a letter to Judge John T. Curtin, 614 United States Court House, Buffalo, New York 14202, stating that you do not wish to take part in the action. At a hearing on December 17, 1971, the court was informed by correctional officials that the inmates of A Block, 6 Company, are in protective confinement and that the Superintendent will immediately determine whether substantial evidence justifies each inmate's continued confinement in A Block, 6 Company. On December 20, the court ordered that the review begin within 48 hours and that each inmate be informed of the evidence against him and given an opportunity to respond. The Superintendent may communicate with the inmate in person or in writing as the Superintendent chooses.

Even if you choose to remain in the action, you are not required by the court's order or by the Department of Correctional Services' rules to respond to the evidence against you or to make any explanation of your behavior. Under the Department's rules, you may sign a statement consenting to your continued confinement in A Block, 6 Company, and a copy of the statement will be sent to the court by correctional authorities. You may at any time revoke your consent to continued confinement in A Block, 6 Company. If you do not consent to continued confinement in A Block, 6 Company, or if you revoke your consent, you need not reply to the evidence against you. If you do not consent to continued confinement in A Block, 6 Company, or if you revoke your consent, the Superintendent, after examining the evidence, will determine whether you should continue to be confined in A Block, 6 Company, or whether you should be returned to general population. You will be informed of the Superintendent's findings and a copy of the findings will be sent to the court. If you disagree with his findings, you have the right to write the Commissioner of Correctional Services regarding your confinement. The Commissioner will inform you of his decision within one week of receipt of your communication.

If the Superintendent determines that you should continue to be confined in A Block, 6 Company, he will review your confinement at least every two weeks.

The court will continue to exercise jurisdiction in the case.